UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

Columbia Division

| | |
|---|---|
| Tracey Knott, Eric Knott and Myranda Knott, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> Steven Deese, Bentley Industries, LLC, Encore ) <br> Boat Builders, LLC, Marine East, Inc. d/b/a ) <br> MarineEast.com, ) <br> ) <br> Defendants. ) <br> ) <br> and ) <br> ) <br> Marine East, Inc., ) <br> ) <br> Third-Party Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> Mariner Sail and Power Yachts, Inc. ) <br> and Marine Tool, Inc., ) <br> ) <br> Third-Party Defendants. ) <br> _____ ) | Civil Action No.:3:11-158-CMC <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ENCORE BOAT BUILDERS, L.L.C.'S AND STEVEN DEESE'S MOTION FOR SUMMARY JUDGMENT** |

This matter comes before the Court upon motion of Encore Boat Builders, L.L.C. ("Encore") and Steven Deese ("Deese") seeking summary judgment on the defense of successor liability and lack of personal liability for a corporate officer. The motion should be denied.

I. **STATEMENT OF THE FACTS**

For purposes of brevity, Plaintiffs rely on their statement of facts and supporting exhibits filed in their memorandum in opposition to the Marine East motion for summary judgment. See docket entry 82. Specific facts relevant to Deese and Encore are related below.

Deese began Bentley Industries, L.L.C ("Bentley") in 2002. Bentley was in the business of designing, manufacturing and selling pontoon boats. Deese owned 99% of the business. His wife Susan owned 1%. (Deposition of Steven Deese, pages 46-47, Exhibit 1). The Bentley main facility was located at 1650 Two Notch Road in Lexington, South Carolina. Bentley also operated a manufacturing facility in Mexico, Missouri. Id. Deese made the decision not to employ engineers for design purposes. Instead, he chose to build his Bentley boats based on the design of another manufacturer called Smoker Craft. Deese acknowledged it was cheaper to copy a pre-existing design than come up with one on his own. (Deposition of Steven Deese, page 49-50, Exhibit 1). Deese personally chose to acquired a Smoker Craft pontoon boat to deconstruct. (Deposition of Steven Deese, page 50-51 Exhibit 1). Bentley pontoon boats were manufactured based on the Smoker Craft design.

The Smoker Craft pontoon boats and the copied Bentley boats utilized bent radius or curved rails for the safety rail and gates.



Bentley curved safety rail and curved gate on Knott boat

The curved rail and gate design forms a pinch point capable of causing amputation of a finger. (Deposition of Steven Deese, page 28, Exhibit 1). In 2002, Bennington Marine Corporation, another manufacturer of pontoon boats with a similar design, issued a recall notice to its customers warning of the hazard. (See September 6, 2011, report of R. Dean Harris, M.E., P.E., Exhibit 2). Bennington proposed a fix for the problem by utilizing a wedge shaped guard. The wedge shaped guard is an effective means of preventing the amputation hazard. (Deposition Brian Boggess, page 75, Exhibit 3), (Deposition David Thompson, pages 95-96, Exhibit 4), (Deposition of R. Dean Harris, page 113, Exhibit 5).

In 2004 Deese personally wrote a Bentley recall letter because of the amputation hazard on his boats. (2004 Recall Letter, Exhibit 6, Deposition of Steven Deese, pages 78-80, Exhibit 1 ). Deese copied the Bennington recall letter. Id. Instead of providing the wedge guard to fix the problem, Deese chose to use another guard. Deese either personally made the decision or approved the decision to purchase a guard manufactured by Marine East for use on Bentley pontoon boats. (Deposition of Steven Deese, pages 82-83, Exhibit 1). Deese chose to use the Marine East guard with little or no testing to ensure the guard worked on his boats. Deese personally did the testing. (Deposition of Steven Deese, page 24, Exhibit 1). Deese described his testing methodology as rubbing his hand, which he acknowledged as large, next to the Marine East ball guard. (Deposition of Steven Deese, pages 24-25, Exhibit 1). He claimed he was unable to get his fingers past the guard and into the pinch point. (Deposition of Steven Deese, page 25, Exhibit 1). Deese did not recall if he tested the effectiveness of the Marine East guard with any other person's hand or any other method. (Deposition of Steven Deese, pages 26-27, Exhibit 1). Deese continually admitted he used the Marine East guard because other manufacturers were doing so. (Deposition of Steven Deese,

pages 20, 22, 26, 27, Exhibit 1).

In a May 2007 deposition in another case entitled Kolesar v. Bentley Industries, LLC, 2006 CP-40-07046, filed in South Carolina state court, Deese was asked about testing the Marine East ball guard.

> Q. Did Bentley test these guards to see if they did the job afer Bentley put them on?
> A. Only to run my hand there and see that ball to see. I didn't jump off a boat with my finger in the pinch area to see if it would pull my finger off, no.
> Q. Did anyone see if the ball device really works?
> A. How would you test it? Jump off a boat?
> Q. So no one tested it at Bentley?
> A. I don't understand your question.
> Q. Did anyone see if the ball device really works?
> A. How would you do that?
> Q. I'm asking you did anyone try?
> A. I don't know how to test it. So if a gun fires, do you hold it to your head and see if it will blow your head off?
> Q. Very good. So it sounds like you just put them on and you didn't see if they actually worked?
> A. No, I did not put my finger in there to see if it would pinch it, no.

(Deposition of Steven Deese, Kolesar v. Bentley, page 60, Exhibit 7).

Despite the presence of the Marine East guard, a gap continued to exist, with the gate in the full open position. See photograph above of curved gate and rail. The gap provides access for a finger to reach the amputation point. Deese wrote in his 2004 recall letter that the guard "...will minimize the possibility of a finger getting caught in a closed or partially closed gate". Deese made no mention of the effectiveness of the guard when the gate was fully open. Users would typically exit the boat through a fully open gate. (2004 Recall Letter, Exhibit 6).

Plaintiffs' expert, Dean Harris, examined the Bentley bent radius design. He concluded the design was defective and unreasonably dangerous. Harris stated the defective handrail and gate design created a foreseeable risk of injury that could easily and inexpensively be eliminated by

alternate design, including use of the wedge type guard offered by Bennington some two years earlier. Harris further concluded the Marine East guard utilized by Deese failed to prevent inadvertent contact by a finger with the amputation hazard when the gate was in the open position. According to Mr. Harris, the Marine East guard was defective and unreasonably dangerous. (See September 6, 2011 Report of R. Dean Harris, M.E., P.E., Exhibit 2). Harris further stated that adequate testing would have revealed the defective nature of the guard. (Deposition of Dean Harris, page 108, Exhibit 5). Harris stated that a reasonable manufacturer would have tested the guard on his product. (Deposition of Dean Harris, page 20, Exhibit 5).

After installing the Marine East guard on 2004 model pontoon boats, Bentley continued to get personal injury claims. (Deposition of Steven Deese, page 35, Exhibit 1). Deese stated the company received claims in 2004, 2005, and 2006. (Deposition of Steven Deese, page 94, Exhibit 1). In 2007 Deese made the decision to recall his pontoon boats again, this time replacing the Marine East guard with the wedge guard offered by Bennington back in 2002. (Deposition of Steven Deese, pages 53, Exhibit 1).

In 2006, Corey and Shelly Bailey of Arizona, purchased a 2006 model Bentley pontoon boat. The boat had the Marine East pinch guards installed. On July 26, 2008, Ms. Tracey Knott, her husband, Eric, and daughter, Myranda, were invited guests on the Bailey pontoon boat while on Lake Pleasant in Arizona. At one point, while the boat was stopped and not underway, Ms. Knott placed her right hand on the safety rail and attempted to jump into the water through the open starboard side gate. The small and ring fingers of her right hand were caught in the pinch point despite the presence of the Marine East pinch guard. Both fingers were ripped off her hand. (Deposition of Tracey Knott, pages 13-14, 18, Exhibit 8). Ms. Knott has had numerous surgeries to

re-attach and try to salvage her hand. Her medical bills total some $260,000.00 dollars.

Shortly before Ms. Knott's injury, in April of 2008, Deese sold 2/3 of his interest in Bentley to a company called Bentley Marine Group, LLC. ("BMG"). (Deposition of Steven Deese, page 55, Exhibit 1). Deese retained a 1/3 interest in Bentley. BMG and Deese intended Bentley to continue to own and operate the pontoon boat manufacturing business. (Bentley Amended and Restated Operating Agreement, Exhibit 9). Bentley continued to manufacture the same pontoon boats from the same facilities in Lexington, South Carolina and Mexico, Missouri. (Deposition of Steven Deese, pages 63-64, Exhibit1). In the sales documents, Deese denied any previous product liability cases, nor any basis for any present or future suits. Deese also denied any previous product recalls, failing to mention his product recall of a year earlier. (See April 4, 2008 Interest purchase Agreement, Section 2.3r, Product Liability, page 7, Exhibit 10). Deese sold 2/3 of his interest for $7 million dollars. He received a promissory note for $6.5 million dollars from the buyers and took back a security interest in the Bentley assets. (Id.; Deposition of Steven Deese, pages 55-56, Exhibit 1). The sale took place with the blessing of Mercury Marine. Id. Previously, in September 2005, Deese personally guaranteed a $7 million dollar loan from Mercury Marine to Bentley. (See 2005 Master Agreement, Exhibit 11). As part of the 2008 sale the individual owners of BMG also executed personal guarantees to Mercury Marine.

In February 2009 Deese, Bentley and BMG and its individual owners defaulted on loans to Mercury Marine. Mercury Marine brought a foreclosure action. Mercury Marine took possession of the Bentley assets. Deese entered into a deal with Mercury Marine, purchasing back Bentley assets and refinancing the monies he owed. (See May 12, 2009 Asset Purchase Agreement, Exhibit 12). In April 2009 Deese formed Encore to receive the Bentley assets. Deese owned 99% of Encore.

(See Encore Amended and Restated Operating Agreement, Exhibit 13). Encore began making pontoon boats at the Two Notch Road facility in Lexington and the facility in Mexico, Missouri. The Encore pontoon boats maintain the same curved rail and gate design with hazardous pinch point.(Deposition of Steven Deese, pages 16, 17, Exhibit 1).  Encore used the Bennington wedge guard at the pinch points. Encore continued to use the name " Bentley" on its boats. See 2011 sales brochure below.  (Deposition of Steven Deese, page 69, 78, Exhibit 1).



Encore 2011 Brochure

Encore continues to use the name "Bentley" to advertise its manufacturing facility in Lexington, South Carolina. (Steven Deese Deposition pages 72, 77, Exhibit 1).


Two Notch Road Encore facility in Lexington

In short, Deese was an owner of Bentley, a business engaged in the manufacture and sale of pontoon boats in Lexington, South Carolina. Deese is the owner of Encore, a business that bought assets of Bentley to engage in the manufacture and sale of similar pontoon boats also known as Bentley pontoon boats, manufactured in the same location.

## II.   SCOPE OF REVIEW

In order to prevail on a motion for summary judgment, the moving party must establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the moving party carries its burden, the nonmoving party may not rest on the allegations in its complaint, but must produce sufficient evidence that demonstrates that a genuine issue exists for trial. Id. at 324. The facts must be viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 255 (1986).

## III. ARGUMENT

### A. What Law Applies

Because this matter is in federal court on diversity grounds, the choice of law rules of the forum state, South Carolina, apply. *Klaxon v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, (1941). In tort actions, South Carolina choice of law rules follow lex loci delicti, that is, the substantive law is determined by the law of the state in which the injury occurred. *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85 (4th Cir. 1989). Here, the injury occurred in Arizona. Thus, Arizona law would apply, including Arizona conflicts of law provisions. *Winsor v. Glasswerks PHX, LLC*, 204 Ariz. 303, 63 P.3d 1040, (Ct. App. 2003). *Winsor v. Glasserks* illustrates Arizona's conflicts of law analysis in the successor liability context. Windsor, the plaintiff, was an Arizona resident. He was injured when a pane of glass he was installing shattered at a job site in Arizona. The glass was manufactured by Labrador Glass Specialties which sold its assets to Glasswerks PHX, LLC two years before the injury. The purchase agreement provided it was to be governed by the laws of California. Windsor brought a products liability case against the successor company. Glasswerks moved for summary judgment claiming Arizona law applied. Glasswerks argued the general rule followed in Arizona was that a successor corporation was not liable for the product defects of the predecessor company unless certain exceptions were met. Windsor maintained California law applied, providing him with the product line theory of successor liability announced under *Ray v. Alad Corp*, 19 Cal. 3d 22, 560 P.2d 3, (1977). The court granted Glasswerks summary judgment. Windsor appealed. The question before the appellate court was whether California or Arizona law applied.

The appellate court recognized that Arizona may apply the law of the state chosen by the

parties to govern their contractual relationships. However, Windsor's claim was a tort action. The court found that claims arising in tort are not typically controlled by a contractual choice of law provision. In the absence of a choice of law provision, Arizona courts follow the Restatement (Second) of Conflicts of Laws (1971). Tort actions are to be adjudicated under the laws of the state having the most significant relationship to both the occurrence and the parties. The court should take into consideration the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile, residence, place of incorporation, and place of business of the parties, and the place where the relationship, if any, between the parties is centered. Completing the analysis, the court reasoned Arizona law applied.

Following the conflict of laws analysis of *Winsor v. Glasswerks*, the following factors must be considered in the present case: The injury occurred in Arizona. The plaintiff Ms. Knott lives in Arizona. However, the conduct causing the injury, i.e, the manufacture, and sale of the Bentley pontoon boat, as well as the decision to purchase Marine East ball guards, occurred in South Carolina. Deese is domiciled in South Carolina. The place of business of the predecessor company, Bentley, was South Carolina. The place of incorporation of the successor company, Encore, is South Carolina. While not determinative by itself, but carrying weight as a factor, the choice of laws provision made by Deese in various asset purchase agreements was South Carolina. Both Arizona and South Carolina could boast having the most significant relationship to the occurrence and the parties. A weighing of these factors, however, suggests South Carolina is the appropriate venue.

      **B.**     **Under South Carolina Law, Encore Is The Mere Continuation of Bentley Since There Was Commonality of Ownership By Deese.**

In *Simmons v. Marklift Industries*, 366 S.C. 308, 622 S.E.2d 213 (Sup. Ct. 2005), the South Carolina Supreme Court declared, in the absence of a statute, a successor or purchasing company ordinarily is not liable for the debts of a predecessor or selling company unless (1) there was an agreement to assume such debts, (2) the circumstances surrounding the transaction warrants a finding of a consolidation or merger of the two corporations, (3) the successor company was a mere continuation of the predecessor, or (4) the transaction was entered into fraudulently for the purpose of wrongfully defeating creditors' claims. The Court found the mere continuation exception applicable only when there is commonality of ownership, *i.e.,* the predecessor and successor corporations have substantially the same officers, directors, or shareholders. The Court noted successor liability was appropriate in *Holloway v. John E. Smith's Sons Co.,* 432 F.Supp. 454 (D.S.C.1977) based on a commonality of ownership.

Here, initially Deese was the majority owner of Bentley. Bentley produced the boat that ultimately injured Ms. Knott. While BMG purchased an ownership interest in Bentley, Deese continued as a Bentley owner. Bentley defaulted and its assets were repossessed by Mercury Marine. Deese bought Bentley assets. Deese created Encore to receive the Bentley assets. Deese was the owner of Encore. Encore, living up to its name, was the final act of Bentley. Bentley and Encore were both businesses engaged in the manufacture and sale of pontoon boats. Both used the same Bentley name. Both used the same assets and inventory. Both used the same bent rail design. Both used the same manufacturing location. Both had the same owner: Deese. From this evidence a jury could find commonality of ownership sufficient for successor liability under *Simmons*.

**C.** **There Is Evidence That Deese Entered Into The Sales Agreement To Fraudulently Defeat Creditor Claims.**

Deese sold his 2/3 interest in Bentley to BMG in 2008. In the sales documents that he signed, Deese denied any previous product liability claims. Yet in his deposition, he admitted to receiving finger injury claims from the pinch point in 2004, 2005 and 2006. In the sales documents he denied the potential for future claims. He also denied having any previous product recalls. Yet, a year earlier, in 2007, Deese recalled his pontoon boats due to continuation of claims arising from the defective Marine East ball guard. A jury could find from this evidence that Deese was attempting to distance himself from at least future products liability claims by selling to BMG. In fact, Deese is taking the position now that his sale to BMG in part insulates Encore from any liability for the sins of Bentley.

### D. If The Court Applies Arizona Law Instead of South Carolina Law, A Similar Result Must Be Reached.

Like South Carolina, the general rule of successor liability in Arizona is that the sale of assets of a corporation does not result in the successor corporation being liable for the predecessor's liabilities unless 1) there is an express or implied agreement of assumption; 2) the transaction amounts to a consolidation or merger of the two corporations; 3) the purchasing corporation is a mere continuation of the seller; or 4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. *A.R. Teeters & Assoc. Inc. v. Eastman Kodak Co.*, 172 Ariz. 324, 836 P.2d 1034 (App. 1992). Under Arizona law, Encore would be liable under the mere continuation exception and the fraud exception.

### E. Successor Liability May Be Based Upon the Successor's Knowledge of The Predecessor's Defective Product.

The Restatement (Third) of Torts: Product Liability §12 (1998) comment raises the prospect

of liability for a successor company where it has actual or constructive knowledge that the predecessor's product is defective and likely to cause injury in the future. The Restatement focused on *Nissen Corporation v. Miller*, 323 Md. 613, 594 A.2d 564 (Ct. App. 1991) a state court of appeals decision from Maryland. There, the plaintiff was injured on a treadmill and brought an action against the manufacturer, American Tredex, and Nissen, the successor of the manufacturer. The issue before the court was whether Maryland should adopt the general rule of nonliability of successor corporations with the four basic exceptions or whether it should adopt a fifth exception for continuity of enterprise. Ultimately, the court declined to extend the rule and summary judgment for Nissen on the issue of successor liability was upheld. The rationale for rejecting the continuity of enterprise exception to nonliability was based upon the notion that risk spreading was not a predominant consideration while some kind of finding of fault was. "A corporate successor is not a seller and bears no blame in bringing the product and the user together. It seems patently unfair to require such a party to bear the cost of unassumed and uncontemplated products liability claims primarily because it is still in business and is perceived as the deep pocket". *Nissen Corporation v. Miller*, 323 Md. at 624, 594 A.2d at 569. At that point, the decision introduced footnote No. 2 which describes liability for a successor who may have fault.

> FN2. In this case, no allegation has been made that Nissen knew or should have known of potential tort liability at the time it purchased American Tredex's assets. Therefore, we need not address the question whether a successor, which knew at the time of asset purchase that there were product liability claims against the predecessor, may be held liable for those claims. We note, however, that the fourth exception, where the transaction was entered into fraudulently to escape liability, may cover such a situation. Also, an interesting alternative to the continuity of enterprise theory has been suggested that may be applicable in such cases. That approach would apply the "bona fide purchaser" rules of property where a corporate successor is sued for its predecessor's products liability. Under that theory, a corporate successor would be "liable for defective products of its predecessor ... if it knew or should have known of those defective products. Under this rule,

corporations may no longer manipulate the form of their corporate acquisitions in an attempt to avoid the predecessor's potential strict products liability. This may put a damper on some corporate acquisitions. However, the rule is consistent with general corporate law policies which seek to protect the successor corporations from unknown liabilities in order to promote free alienability and stable predictability in corporate acquisitions, since under the rule there is liability only for known liabilities." (Footnote omitted.)
Comment, *A Policy Analysis of a Successor Corporation's Liability for Its Predecessor's Defective Products When the Successor Has Acquired the Predecessor's Assets for Cash,* 71 Marquette L.Rev. 815, 848-49 (1988).

Following this analysis above, Deese's successor company Encore does not appear blameless or without fault. Deese and Encore purchased assets of the predecessor company Bentley knowing of the defective nature of the Bentley pontoon boat radius bent rail and Marine East guard. Deese and Encore knew Bentley was defunct and thus not capable of responding to products liability creditors. Under the rationale discussed in *Nissen Corporation v. Miller*, Encore may be liable based upon its knowledge of the defectiveness of the radius bent rail and the Marine East finger pinch guard sold by the predecessor company.

### F. Aside from Successor Liability, Encore Has An Independent Post Sale Duty To Warn.

Even if Encore is found not to be liable as a successor corporation based upon the traditional rule of nonliability, a successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention. *Nissen Corporation v. Miller*, 323 Md. 613, 594 A.2d 564 (Ct. App. 1991). The Restatement (Third) of Torts (Products Liability) § 13 (1998), states:

> (a) A successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity ... is subject to liability for harm to persons or property caused by the successor's failure to warn of a risk created by a product sold or distributed by the predecessor if:
>
> (1) the successor undertakes or agrees to provide services for maintenance or repair

of the product or enters into a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor, and

(2) a reasonable person in the position of the successor would provide a warning.

(b) A reasonable person in the position of the successor would provide a warning if:

(1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

(2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

(3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

(4) the risk of harm is sufficiently great to justify the burden of providing a warning.

See unpublished opinion *Gariby v. Evenflow Company*, 2012 WL 506742 (Arizona).

Here, Encore and Deese knew of the substantial risk of injury to individuals from the pontoon boat gate rail configuration and the defective Marine East ball guard. Encore and Deese knew the Bentley boats were defective and unreasonably dangerous. Encore could have issued a warning to previous Bentley owners and dealers prohibiting use of the Marine East guard under any conditions. Encore could have issued a warning to previous Bentley owners and dealers correctly explaining the need for the wedge guard.[1] Encore never did. Under the Restatement, a jury could

---

[1] Bentley did issue a recall of the Marine East guard in 2007 on its own. (Deposition of Steven Deese, page 77, Exhibit 1). However, the recall notice was confusing. It suggested exposure to the safety hazard occurred with a closed or partially closed gate, thus implying no safety hazard existed with a gate in the open position. A belief the gate was safe in the open position would eliminate incentive for a boat owner to fix the problem. Of course, the amputation hazard is most pronounced with an open gate. A correctly worded warning from Encore not to use its guard under any conditions would have likely resulted in proper guards being placed on the Plaintiff's boat.

find Encore had a post sale duty to warn.

> **G. There Is Evidence Deese Is Liable Since He Was Personally Involved In The Decision Making And Actions That Led To The Manufacture And Sale of Defective Boats.**

Deese misunderstands the theory of liability against him. Plaintiffs case is not based upon "piercing the corporate veil". Rather, liability is centered on Deese's personal involvement in negligent decision making and actions that resulted in the manufacture and sale of defective pontoon boats. It is true that corporate directors are not personally liable for torts committed by the corporation or by one of its officers merely by virtue of the office they hold. In South Carolina, there is a strong presumption that "an officer or a director of a corporation is not, merely as a result of his standing as such, personally liable for torts" of the corporation. *Hunt v. Rabon,* 275 S.C. 475, 272 S.E.2d 643, 644 (1980). However, in those rare cases where a corporate director has "in some way participated in or directed the tortious act," personal liability will attach. *Steinke v. Beach Bungee, Inc.,* 105 F.3d 192 (4th Cir. 1997) (applying South Carolina law). To be held liable, the directors or officers must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management or supervision of the corporate affairs causing or contributing to the injury. *Bischofshausen v. D.W. Jaquays Mining and Equipment*, 145 Ariz. 204, 700 P.2d 902 (Ariz. App. 1985). Under some circumstances a corporate officer or director may be personally liable for torts committed by a corporation if the officer or director personally participates in the tort. *Warne Investments v. Higgins*, 219 Ariz. 186, 195 P.3d 645 (Ariz. App. Div. 1, 2008).

Here, Deese personally made decisions and engaged in conduct resulting in manufacture of defective pontoon boats.

> 1) In starting Bentley, Deese made the decision not to hire an engineer to design

pontoon boats because it was cheaper to simply copy a Smoker Craft design. The Smoker Craft design contained the defective gate and rail condition. The copied Bentley design also contained the hazard. Deese is personally responsible for the design he chose to use. A design professional would have recognized the hazard and properly eliminated it. Deese's choice of rail design was negligent.

2) Once Deese recognized the hazardous condition he failed to adopt a reasonable guarding device. A reasonable guard was available. Bennington had been offering the wedge guard on its pontoon boats since 2002. Deese failed to install any guard until 2004. When he did, Deese personally chose to purchase and install the Marine East guard. Deese did so without proper testing. Deese knew the mechanism of injury involved fingers being jammed into the pinch point as individuals jumped from the deck of the pontoon boat into the water below. Deese did no testing to replicate the foreseeable forces involved with these traumatic amputations and to determine if his choice of guard was capable of eliminating the risk of injury. He simply moved his hand over the Marine East guard and pronounced it good. He did so knowing women and children, and those with smaller hands and fingers, would foreseeably be present on his boats. He did so knowing, or at least he should have known, that the guard he chose left a gap or access to the pinch point when the gate was in the open position. The gap renders the guard ineffective. The 2004 recall letter that Deese personally wrote said that his chosen safety device designed to fix the problem would work at a closed or partially closed gate. Certainly, any safety device must work when it is most needed, and that of course is when people are moving through an open gate. The Marine East guard on Deese's rail and gate did not work to eliminate the hazard when the gate was open. Adequate testing would have revealed the defect of the guard. Deese's choice of guard was negligent.

3) Deese knew claims continued to arise despite his purchase of Marine East ball

guards. Deese stated the company continued to get claims in 2004, 2005, and 2006. Yet Deese did not act until 2007. In 2007, Deese personally wrote his second recall letter and made the decision to change to the wedge guard. The boat Ms. Knott was injured upon was manufactured in 2006. If Deese had responded timely to the mounting claims, he could have timely switched guards and outfitted the Knott boat with a reasonable safety guard. Deese's inaction despite mounting claims was negligent.

From this evidence a jury could reasonably conclude Deese was personally engaged in the tortious activity that resulting in Ms. Knott's injury.

## IV. CONCLUSION

For the reasons stated above, Defendant Encore and Deese's motion for summary judgment should be denied.

                                            KASSEL MCVEY, Attorneys at Law

                                        By:    s/ John D. Kassel
                                                 JOHN D. KASSEL, FED ID 2278
                                                 THEILE B. McVEY, FED ID 7614
                                                 1330 Laurel Street
                                                 Post Office Box 1476
                                                 Columbia, South Carolina 29202

                                                 Attorneys for Plaintiff

Columbia, South Carolina
March 30, 2012